AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-28/19)

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information associated with Nine (9) Target Accounts<br>for Investigation of 18 U.S.C. § 1343 and Other<br>Offenses, more fully described in Attachments A and C. | )<br>)<br>)<br>)<br>)<br>) Case No.  MJ21-360 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Five (5) Facebook Accounts and Four (4) Twitter Accounts more fully described in Attachments A and C, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B and D, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1342 | Wire Fraud |
| 18 U.S.C. § 1348 | Securities Fraud |

The application is based on these facts:

✓ See Affidavit of FBI SA Kathleen Moran, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

*Applicant's signature*

Kathleen Moran, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
⊙ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:  06/16/2021 at 11:45 am

*Judge's signature*

City and state:  Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

# **AFFIDAVIT**

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF KING               )

    I, Kathleen Moran, a Special Agent of the Federal Bureau of Investigation, being first duly sworn, depose and state as follows:

## I.    SUMMARY AND PURPOSE OF AFFIDAVIT.

    1.    This affidavit is submitted in support of an application for search warrants for retained communications and other records of the following Facebook accounts associated with Justin Costello and/or with entities associated with Justin Costello:

    a. Justin Costello = user ID 100040587769665

    b. GRN Holding Corporation = user ID GRNHoldingCorp

    c. GRNF VIP = user ID 910260356004696

    d. GRN Holding Corporation Empire = user ID 914636418886355

    e. Hempstract VIP = user ID 517576265620242

(collectively, the "Subject Facebook Accounts"), and for the following Twitter accounts associated with Justin Costello and/or with other individuals or entities associated with Justin Costello:

    f.  Justin Costello = user name @IncGrn
            URL: https://twitter.com/IncGrn

    g. GRN Holding Corporation = user name @GRNHoldingCorp
            URL: https://twitter.com/grnholdingcorp

    h. Hempstract = user name @IrHPST
            URL: https://twitter.com/irhpst

    i. David Ferraro = user name @computerbux
            URL: https://twitter.com/computerbux

(collectively, the "Subject Twitter Accounts").

Affidavit of Special Agent Moran - 1
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2.      The FBI is currently investigating Justin Costello for numerous violations of the federal mail fraud and securities fraud statutes for, among other things: (1) making material misrepresentations and omissions to investors to induce them to purchase shares of his companies; (2) making material misrepresentations and omissions and engaging in manipulative trading activity in connection with a possible pump and dump scheme; and (3) making material misrepresentations to a California-based marijuana company in connection with Costello's operation of a banking company.

3.      For example, when soliciting investors to invest in his companies, Costello claimed that he was a billionaire whose private equity and hedge fund company had $1.15 billion in assets under management, while his bank holding company had $1.2 billion in deposits.  Furthermore, according to one investor, Costello portrayed himself as a licensed investment advisor even though he is not licensed or registered to manage investors' funds.  Based upon these representations and others, this investor subsequently invested over $2 million into Costello's companies and allowed Costello to manage approximately $4 million in a brokerage account.

4.      The investigation has revealed there is probable cause to believe Costello also unlawfully manipulated the publicly-traded stocks of his companies by artificially controlling the price and volume of traded shares in the manipulated stocks through, among other things: 1) generating artificial trading volume in the stocks; 2) purchasing the stocks in the account of an unwitting investor; 3) conducting matched trades using the unwitting investors' account.  Costello profited after selling the fraudulently inflated shares of at least one of the companies he was associated with, Riverdale Oil and Gas Corporation (later known as Hempstract Inc.).

5.      The Subject Facebook Accounts belong to Costello and to private Facebook groups associated with companies owned by Justin Costello.  The investigation has revealed that Costello used the Subject Facebook Accounts to communicate with investors or potential investors, to generate artificial interest and demand in the stock of his companies, and on at least two occasions, to post statements about Costello's

Affidavit of Special Agent Moran - 2
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   companies purporting to be from an investor, when in fact Costello wrote the statements.

2   There is probable cause to believe, therefore, that these Facebook accounts contain

3   evidence relevant to the offenses of wire fraud and securities fraud.

4         6.     The Subject Twitter Accounts belong to Costello, Costello's companies,

5   and David Ferraro, an individual who posted about Costello's companies apparently in

6   exchange for renumeration by Costello.  The investigation has revealed that Costello used

7   the Subject Twitter Accounts to communicate with investors or potential investors, to

8   generate artificial interest and demand in the stock of his companies, and on at least one

9   occasion, to provide material, non-public information before it was announced to the

10   public.  There is probable cause to believe, therefore, that these Twitter accounts contain

11   evidence relevant to the offenses of wire fraud and securities fraud.

12         7.     The facts set forth in this Affidavit are based on information obtained by

13   me and others during this investigation from a variety of sources, including, but not

14   limited to: (a) information provided to me by investors; (b) business records and other

15   documents obtained from various entities; (c) information provided to me by the U.S.

16   Securities and Exchange Commission which is conducting a parallel, civil regulatory

17   investigation; and (d) publicly available documents.

18         8.     Because this Affidavit is submitted for the limited purpose of establishing

19   probable cause in support of the application for search warrants, it does not set forth each

20   and every fact that I or others have learned during the course of this investigation.  I have

21   set forth only the facts that I believe are necessary to establish probable cause to believe

22   that evidence, fruits and instrumentalities of violations of Title 18, United States Code,

23   Section 1343 (Wire Fraud) and Section 1348 (Securities Fraud), will be found within the

24   Subject Facebook Accounts and Subject Twitter Accounts.

25   **II.     EXPERIENCE OF AGENT.**

26         9.     I am a Special Agent of the Federal Bureau of Investigation ("FBI")

27   currently assigned to the white-collar crime squad in the Seattle Field Division.  I have

28   been employed as a Special Agent of the FBI since May 2005.   I have received basic

Affidavit of Special Agent Moran - 3
USAO# 2019R00959

1  federal law enforcement training, including the training at the FBI Academy, as well as

2  other specialized federal law enforcement training.  I have investigated violations of

3  federal statutes governing various types of white-collar crime, including wire fraud, mail

4  fraud, bank fraud, securities fraud, money laundering, and theft of government and public

5  money.

### III.   LOCATIONS TO BE SEARCHED.

6

7      10.   I make this affidavit in support of an application for two search warrants,

8  pursuant to Federal Rule of Criminal Procedure 41, and Title 18, United States Code,

9  Section 2703, to search the electronic communications contained in, as well as all

10  subscriber and log records associated with, the following Facebook and Twitter accounts:

11        a.   Justin Costello = user ID 100040587769665

12        b.   GRN Holding Corporation = user ID GRNHoldingCorp

13        c.   GRNF VIP = user ID 910260356004696

14  

15        d.   GRN Holding Corporation Empire = user ID 914636418886355

16        e.   Hempstract VIP = user ID 517576265620242

17        f.   Justin Costello = user name @IncGrn

18           URL: https://twitter.com/IncGrn

19        g.   GRN Holding Corporation = user name @GRNHoldingCorp

20           URL: https://twitter.com/grnholdingcorp

21        h.   Hempstract = user name @IrHPST
         URL: https://twitter.com/irhpst

22  

23        i.   David Ferraro = user name @computerbux
         URL: https://twitter.com/computerbux

24  

25      11.   The Subject Facebook Accounts are located on the premises owned,

26  maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking

27  company headquartered in Menlo Park, California, as further described in Attachment A,

28  attached hereto and incorporated herein.  Facebook owns and operates a free-access

Affidavit of Special Agent Moran - 4
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

social networking website of the same name that can be accessed at

http://www.facebook.com.  Facebook allows its users to establish accounts with

Facebook, and users can then use their accounts to share written news, photographs,

videos, and other information with other Facebook users, and sometimes with the public.

Facebook also provides a free messaging application, Facebook Messenger, where

Facebook users can send direct messages to each other.

12.     To set up an account, Facebook asks users to provide basic contact and

personal identifying information to Facebook, either during the registration process or

thereafter.  This information may include the user's full name, birth date, gender, contact

e-mail addresses, Facebook passwords, physical address (including city, state, and zip

code), telephone numbers, screen names, websites, and other personal identifiers.

Facebook also assigns a user identification number to each account.

13.     Facebook users may join one or more groups or networks to connect and

interact with other users who are members of the same group or network.  Facebook

assigns a group identification number to each group.  A Facebook user can also connect

directly with individual Facebook users by sending each user a "Friend Request."  If the

recipient of a "Friend Request" accepts the request, then the two users will become

"Friends" for purposes of Facebook and can exchange communications or view

information about each other.  Each Facebook user's account includes a list of that user's

"Friends" and a "News Feed," which highlights information about the user's "Friends,"

such as profile changes, upcoming events, and birthdays.

14.     Facebook users can select different levels of privacy for the

communications and information associated with their Facebook accounts.  By adjusting

these privacy settings, a Facebook user can make information available only to himself or

herself, to particular Facebook users, or to anyone with access to the Internet, including

people who are not Facebook users.  A Facebook user can also create "lists" of Facebook

friends to facilitate the application of these privacy settings.  Facebook accounts also

1   include other account settings that users can adjust to control, for example, the types of
2   notifications they receive from Facebook.

3        15.    Facebook users can create profiles that include photographs, lists of
4   personal interests, and other information.  Facebook users can also post "status" updates
5   about their whereabouts and actions, as well as links to videos, photographs, articles, and
6   other items available elsewhere on the Internet.  Facebook users can also post information
7   about upcoming "events," such as social occasions, by listing the event's time, location,
8   host, and guest list.  In addition, Facebook users can "check in" to particular locations or
9   add their geographic locations to their Facebook posts, thereby revealing their geographic
10   locations at particular dates and times.  A particular user's profile page also includes a
11   "Wall," which is a space where the user and his or her "Friends" can post messages,
12   attachments, and links that will typically be visible to anyone who can view the user's
13   profile.

14        16.    Facebook allows users to upload photos and videos, which may include any
15   metadata such as location that the user transmitted when they uploaded the photo or
16   video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a
17   photo or video.  When a user is tagged in a photo or video, he or she receives a
18   notification of the tag and a link to see the photo or video.  For Facebook's purposes, the
19   photos and videos associated with a user's account will include all photos and videos
20   uploaded by that user that have not been deleted, as well as all photos and videos
21   uploaded by any user that have that user tagged in them.

22        17.    Facebook users can exchange private messages on Facebook with other
23   users.  Those messages are stored by Facebook unless deleted by the user.  Facebook
24   users can also post comments on the Facebook profiles of other users or on their own
25   profiles; such comments are typically associated with a specific posting or item on the
26   profile.  In addition, Facebook runs a messenger application, Facebook Messenger, that
27   allows users to send and receive instant messages.  These chat communications are stored
28   in the chat history for the account.  Facebook also has Video and Voice Calling features,

Affidavit of Special Agent Moran - 6
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  and although Facebook does not record the calls themselves, it does keep records of the
2  date of each call.

3    18.    If a Facebook user does not want to interact with another user on Facebook,
4  the first user can "block" the second user from seeing his or her account.

5    19.    Facebook has a "like" feature that allows users to give positive feedback or
6  connect to particular pages.  Facebook users can "like" Facebook posts or updates, as
7  well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook
8  users can also become "fans" of particular Facebook pages.

9    20.    Facebook has a search function that enables its users to search Facebook for
10 keywords, usernames, or pages, among other things.

11   21.    Each Facebook account has an activity log, which is a list of the user's
12 posts and other Facebook activities from the inception of the account to the present.  The
13 activity log includes stories and photos that the user has been tagged in, as well as
14 connections made through the account, such as "liking" a Facebook page or adding
15 someone as a friend.  The activity log is visible to the user but cannot be viewed by
16 people who visit the user's Facebook page.

17   22.    Facebook also has a Marketplace feature, which allows users to post free
18 classified ads.  Users can post items for sale, housing, jobs, and other items on the
19 Marketplace.

20   23.    In addition to the applications described above, Facebook also provides its
21 users with access to thousands of other applications ("apps") on the Facebook platform.
22 When a Facebook user accesses or uses one of these applications, an update about that
23 the user's access or use of that application may appear on the user's profile page.

24   24.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP
25 address.  These logs may contain information about the actions taken by the user ID or IP
26 address on Facebook, including information about the type of action, the date and time of
27 the action, and the user ID and IP address associated with the action.  For example, if a

28

Affidavit of Special Agent Moran - 7
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  user views a Facebook profile, that user's IP log would reflect the fact that the user

2  viewed the profile, and would show when and from what IP address the user did so.

3      25.     Social networking providers like Facebook typically retain additional

4  information about their users' accounts, such as information about the length of service

5  (including start date), the types of service utilized, and the means and source of any

6  payments associated with the service (including any credit card or bank account number).

7  In some cases, Facebook users may communicate directly with Facebook about issues

8  relating to their accounts, such as technical problems, billing inquiries, or complaints

9  from other users.  Social networking providers like Facebook typically retain records

10 about such communications, including records of contacts between the user and the

11 provider's support services, as well as records of any actions taken by the provider or

12 user as a result of the communications.

13     26.     As explained herein, information stored in connection with a Facebook

14 account may provide crucial evidence of the "who, what, why, when, where, and how" of

15 the criminal conduct under investigation, thus enabling the United States to establish and

16 prove each element or alternatively, to exclude the innocent from further suspicion.  In

17 my training and experience, a Facebook user's IP log, stored electronic communications,

18 and other data retained by Facebook, can indicate who has used or controlled the

19 Facebook account.  This "user attribution" evidence is analogous to the search for

20 "indicia of occupancy" while executing a search warrant at a residence.  For example,

21 profile contact information, private messaging logs, status updates, and tagged photos

22 (and the data associated with the foregoing, such as date and time) may be evidence of

23 who used or controlled the Facebook account at a relevant time.  Further, Facebook

24 account activity can show how and when the account was accessed or used.  For

25 example, as described herein, Facebook logs the Internet Protocol (IP) addresses from

26 which users access their accounts along with the time and date.  By determining the

27 physical location associated with the logged IP addresses, investigators can understand

28 the chronological and geographic context of the account access and use relating to the

Affidavit of Special Agent Moran - 8
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   crime under investigation.  Such information allows investigators to understand the

2   geographic and chronological context of Facebook access, use, and events relating to the

3   crime under investigation.  Additionally, Facebook builds geo-location into some of its

4   services.  Geo-location allows, for example, users to "tag" their location in posts and

5   Facebook "friends" to locate each other.  This geographic and timeline information may

6   tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook

7   account activity may provide relevant insight into the Facebook account owner's state of

8   mind as it relates to the offense under investigation.  For example, information on the

9   Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

10  information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting

11  account information in an effort to conceal evidence from law enforcement).

12        27.     Therefore, Facebook's servers and computers are likely to contain all the

13  material described above, including stored electronic communications and information

14  concerning subscribers and their use of Facebook, such as account access information,

15  transaction information, and other account information.

16        28.     This application seeks warrants to search the Subject Facebook Accounts

17  and seize the items listed in Attachment B, which is attached to this affidavit and

18  incorporated herein by reference for evidence, fruits, and instrumentalities of violations

19  of Title 18, United States Code, Section 1343 (Wire Fraud) and Section 1348 (Securities

20  Fraud).

21        29.     The Subject Twitter Accounts are located on the premises owned,

22  maintained, controlled, or operated by Twitter, Inc., a social networking company

23  headquartered in San Francisco, California, as further described in Attachment C,

24  attached hereto and incorporated herein.  Twitter owns and operates a free-access social-

25  networking website of the same name that can be accessed at http://www.twitter.com.

26  Twitter allows its users to create their own profile pages, which can include a short

27  biography, a photo of themselves, and location information.  Twitter also allows users to

28

Affidavit of Special Agent Moran - 9
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  create and read 140-character messages called "Tweets," and to restrict their "Tweets" to

2  individuals whom they approve. These features are described in more detail below.

3      30.    Upon creating a Twitter account, a Twitter user must create a unique

4  Twitter username and an account password, and the user may also select a different name

5  of 20 characters or fewer to identify his or her Twitter account. The Twitter user may also

6  change this username, password, and name without having to open a new Twitter

7  account.

8      31.    Twitter asks users to provide basic identity and contact information, either

9  during the registration process or thereafter. This information may include the user's full

10  name, e-mail addresses, physical address (including city, state, and zip code), date of

11  birth, gender, hometown, occupation, and other personal identifiers. For each user,

12  Twitter may retain information about the date and time at which the user's profile was

13  created, the date and time at which the account was created, and the Internet Protocol

14  ("IP") address at the time of sign-up. Because every device that connects to the Internet

15  must use an IP address, IP address information can help to identify which computers or

16  other devices were used to access a given Twitter account.

17      32.    A Twitter user can post a personal photograph or image (also known as an

18  "avatar") to his or her profile and can also change the profile background or theme for his

19  or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer

20  to their profile pages.

21      33.    Twitter also keeps IP logs for each user. These logs contain information

22  about the user's logins to Twitter including, for each access, the IP address assigned to

23  the user and the date stamp at the time the user accessed his or her profile.

24      34.    As discussed above, Twitter users can use their Twitter accounts to post

25  "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays

26  when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or

27  reply to the Tweets of other users. In addition, when a Tweet includes a Twitter

28  username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of

Affidavit of Special Agent Moran - 10
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

35.     Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

36.     Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

37.     When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

38.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

39.     A Twitter user can use the "block" feature to restrict specific accounts from contacting them, seeing their Tweets, and following them.  A Twitter user can use the

Affidavit of Special Agent Moran - 11
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   "mute" feature to remove an account's Tweets from his or her timeline without
2   unfollowing or blocking the account.

3       40.    In addition to posting Tweets, a Twitter user can also send Direct Messages
4   (DMs) to one of his or her followers. These messages are typically visible only to the
5   sender and the recipient, and both the sender and the recipient have the power to delete
6   the message from the inboxes of both users. As of January 2012, Twitter displayed only
7   the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

8       41.    Twitter users can configure the settings for their Twitter accounts in
9   numerous ways. For example, a Twitter user can configure his or her Twitter account to
10   send updates to the user's mobile phone, and the user can also set up a "sleep time"
11   during which Twitter updates will not be sent to the user's phone.

12       42.    Twitter includes a search function that enables its users to search all public
13   Tweets for keywords, usernames, or subject, among other things. A Twitter user may
14   save up to 25 past searches.

15       43.    Twitter users can connect their Twitter accounts to third-party websites and
16   applications, which may grant these websites and applications access to the users' public
17   Twitter profiles.

18       44.    If a Twitter user does not want to interact with another user on Twitter, the
19   first user can "block" the second user from following his or her account.

20       45.    In some cases, Twitter users may communicate directly with Twitter about
21   issues relating to their account, such as technical problems or complaints. Social-
22   networking providers like Twitter typically retain records about such communications,
23   including records of contacts between the user and the provider's support services, as
24   well as records of any actions taken by the provider or user as a result of the
25   communications. Twitter may also suspend a particular user for breaching Twitter's
26   terms of service, during which time the Twitter user will be prevented from using
27   Twitter's services.

28

Affidavit of Special Agent Moran - 12
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

46.     As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time.  Further, Twitter account activity can show how and when the account was accessed or used.  For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation.  Additionally, Twitter builds geo-location into some of its services.  If enabled by the user, physical location is automatically added to "tweeted" communications.  This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner.  Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation.  For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

Affidavit of Special Agent Moran - 13
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

47.     Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

48.     This application seeks warrants to search the Subject Twitter Accounts and seize the items listed in Attachment D, which is attached to this affidavit and incorporated herein by reference for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud) and Section 1348 (Securities Fraud).

## IV.     RELEVANT LEGAL PROVISIONS.

49.     Title 18, United States Code, Section 1343 (Wire Fraud) provides that it is a violation of federal law when someone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

50.     Title 18, United States Code, Section 1348 (Securities Fraud) provides that whoever knowingly executes, or attempts to execute, a scheme or artifice: (1) to defraud any person in connection with any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)); or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d))... [has committed the offense of securities fraud].

51.     As discussed in more detail below, probable cause exists to believe that Costello defrauded investors by making fraudulent statements about his background and success in investing and by generating artificial interest and demand in the stock of his companies, including, among other ways, by using the Subject Facebook Accounts and the Subject Twitter Accounts.  Relying on the information shared in the Subject Facebook Accounts and the Subject Twitter Accounts, investors purchased shares of Costello's companies, driving up the price of the shares and benefiting Costello.

## V.     INVESTIGATION

### A.     Relevant Individual and Entities

52.     **Justin Costello**: Justin Costello, a resident of Bellevue, Washington, owns several companies related to the cannabis industry and portrays himself as a self-made billionaire.  From at least the fall of 2017, Costello's companies, including Pacific Banking Corp., primarily provided banking services to marijuana companies located in Washington State, Colorado, and California.[1]  In April and June 2019, Pacific Banking Corp. entered into agreements with a California-based cannabis business to provide banking services.  In these agreements, Pacific Banking Corp., through Costello, agreed to "only take actions on the account or execute transactions as authorized by [the cannabis business]."  The cannabis business initially transferred more than $9 million to a bank account belonging to GRN Funds LLC.  Initially, Pacific Banking Corp. honored the agreements and promptly paid the business' employees and vendors.  By November 2019, the relationship began to break down and Pacific Banking Corp. failed to make a $1 million tax payment to the State of California on behalf of the cannabis business.  Costello falsely stated that the payment had been made, and he offered no explanation as to what had happened to the funds.  In addition, Pacific Banking Corp. sent the cannabis

---

[1] Although numerous states have legalized the cultivation, production, and distribution of retail or medicinal marijuana, these activities remain violations of federal law.  Thus, banks in the United States have historically been hesitant to provide banking services to marijuana companies.  Costello's services purported to help these companies navigate the banking system.

business false and fraudulent account statements showing that the payment had been made, but then returned to the account.  The cannabis business's attempts to retrieve its remaining funds, approximately $3 million, from Costello and Pacific Banking Corp. were unsuccessful.  A review of the financial records indicated that Costello diverted the cannabis business's funds, co-mingled them with other clients' funds, and used them elsewhere to benefit his companies.

53.     At some point, Costello shifted to owning and operating his own marijuana and CBD companies, both publicly and privately held.  Costello manages and is the Chief Executive Officer (CEO) of GRN Funds, LLC, described as a private equity and hedge fund.  On its website, GRN Funds, LLC claimed to have $1.15 billion in assets under management, and $600 million under deposit.  An FBI analysis of financial records does not support this claim.  In a Form 8K for Discovery Gold Corporation filed with the U.S. Securities and Exchange Commission (SEC) on July 1, 2019, and signed by Costello, Costello described himself as a graduate of the University of Minnesota and a graduate of Harvard Business School.  In an amended Form 8K filed on October 2, 2019, again signed by Costello, Costello described himself as a graduate of Winona State University who attended Harvard University, but did not graduate.

54.     **Discovery Gold Corporation/GRN Holding Corporation:**  GRN Holding Corporation is a Nevada shell corporation formed in 2010 under the name Norman Cay Development Inc.  On July 12, 2012, the name of the company was changed to Discovery Gold Corporation, and its stock traded on the over-the-counter (OTC) market under the ticker symbol DCGD.  Between 2012 and 2018, DCGD generated no revenue.  On June 20, 2019, GRN Funds, LLC purchased 55.65% of DCGD's outstanding shares for $300,000.[2]  At the time, DCGD was trading at a price of approximately $.004 per share.  After completing the reverse merger, Costello became Director, President, and CEO of DCGD.  On July 16, 2019, DCGD changed its name to

---

[2] A private company purchasing the majority of a publicly-traded shell company's stock is commonly referred to as a "reverse merger."

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    GRN Holding Corporation and subsequently changed its ticker symbol to GRNF.  By

2    September 2019, GRNF was trading close to $2.00 per share, even though the company

3    had yet to earn any revenue and had no business operations.  GRN Holding Corporation's

4    office address is in Seattle, Washington.

5         55.    **Riverdale Oil and Gas Corporation/Hempstract Inc.:**  Hempstract Inc.

6    is a Nevada corporation formed in 2007.  Hempstract Inc. was previously known as

7    Helisys, Inc., then Fraser Industries, Inc., and finally Riverdale Oil and Gas Corporation,

8    where it traded on the OTC market under the ticker symbol RVDO.[3]  On February 28,

9    2020, Manufacturing 360 LLC, another company owned by Justin Costello, acquired a

10   controlling interest of the outstanding shares of RVDO and Richard Hawkins was

11   appointed as CEO and President (Hawkins is also a member of GRN Holding Corp. and

12   was involved with Pacific Banking Corp. as well).  At the time Costello acquired the

13   shares, RVDO was trading at approximately $.09 per share.  RVDO discontinued and

14   spun off its oil and gas interest, and its new business plan involved developing and selling

15   hemp-based products.  By July 2020, RVDO was trading at approximately $1.40 per

16   share, despite having no revenue or business operations.

17        56.    On August 6, 2020, RVDO acquired all the assets of Hempstract LLC, a

18   Washington State Limited Liability Company.  According to the certificate of formation

19   and initial report for Hempstract LLC, filed with Washington State on May 2, 2019,

20   Justin Costello served as Executor/Governor of the company and Richard Hawkins was

21   the Registered Agent.  Costello received approximately 24 million shares of RVDO in

22   exchange for Hempstract LLC's assets, allegedly valued at approximately $11 million

23   dollars.  On October 20, 2020, Riverdale Oil and Gas changed its name to Hempstract,

24   Inc. (ticker symbol HPST).  According to a disclosure statement filed by Hempstract Inc.

25   for the period ending December 31, 2020, Hempstract Inc. had no revenue for the year.

26

27   _____

28   [3] Interestingly, prior to Costello's involvement with RVDO, RVDO was the subject of a previous manipulative
     trading scheme in this District.  *See* Plea Agreement of Alexander Hawatmeh, *United States v. Alexander
     Hawatmeh*, CR14-5348 RBL, Dkt. 86, paragraph 9f.

Affidavit of Special Agent Moran - 17
USAO# 2019R00959

1  Hempstract Inc. shares an office space in Seattle with GRN Holding Corp.  Costello owns

2  approximately 26% of the outstanding shares of Hempstract Inc.  Costello was the

3  Chairman of the Board of Hempstract, Inc., until resigning on May 18, 2021.

4  **B.**    **Costello solicited investors by making false representations**

5       57.    From at least November 2018 through May 2020, Costello recruited and

6  solicited investors to make investments in several of his entities, including GRN Funds,

7  LLC, Discovery Gold Corp./GRN Holding Corp., and Riverdale Oil and Gas/Hempstract.

8  When soliciting these investors, Costello made several material misrepresentations

9  concerning his background and historical success in business.

10  **Investors J.W. and D.W.**

11       58.    Investor J.W. met Justin Costello in November 2018.  Costello told J.W.

12  that he was a former military commando who had done two tours in Iraq and had been

13  shot twice.  In sworn testimony provided to the SEC on February 3, 2021, Costello

14  admitted that he had never served in the armed forces.  Costello also told J.W. that he was

15  a billionaire.  Costello described GRN Holding Corp. as a conglomerate comprised of

16  companies involved in the cannabis industry.  To support his claim, Costello emailed

17  J.W. a list of the companies and their annual revenues, including a bank holding company

18  with a purported $1.12 billion in deposits.  An FBI analysis of financial records does not

19  support Costello's claim that the bank holding company had anything close to $1.12

20  billion in deposits.  J.W. and his father, D.W., relying on the information Costello

21  provided about himself and GRN Holding Corp., each purchased 33,333 shares of DCGD

22  for $25,000 directly from Costello.  D.W. also purchased additional GRNF shares in his

23  brokerage account.

24       59.    In February 2020, Costello texted J.W. and told D.W. and J.W. to open

25  brokerage accounts because the Hempstract Initial Public Offering (IPO) was going to

26  happen.  Costello texted that Costello was going to make $36 million on this deal and

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   wrote "this will have a GRNF epic run"[4] and J.W. should "watch this shit the next 2

2   weeks."  Following Costello's texts, J.W. opened his brokerage account in early March

3   2020 and purchased 16,900 shares of RVDO.  D.W. also purchased shares of RVDO.  On

4   April 28, 2020, RVDO publicly announced a non-binding letter of intent to acquire the

5   assets of Hempstract LLC, which was not completed until August 6, 2020.

6   **Investor S.T.**

7       60.    By at least August 2019, S.T. had met Costello through S.T.'s hair stylist

8   who was Costello's girlfriend at the time.  During their relationship, Costello told

9   investor S.T. that he went to Harvard, he managed money for a sheikh, and he was the

10   youngest billionaire under 40 years old.  Costello offered to sell restricted shares of

11   RVDO to S.T. as part of a "friends and family" deal.  In February 2020, S.T. gave

12   Costello a $100,038 check written to Manufacturing 360 LLC for shares of RVDO.  S.T.

13   also gave Costello a check for approximately $125,000 for shares of GRNF.  Costello

14   suggested S.T. open a brokerage account, which S.T. did at TD Ameritrade in the spring

15   of 2020.  According to S.T., she funded the account with a couple of hundred thousand

16   dollars.  S.T. conducted all the trading in the account, but Costello told S.T. when and

17   what to buy and sell.  Among other OTC stocks, Costello instructed S.T. to buy and sell

18   GRNF, RVDO, and other stocks, including China Networks International Holdings,[5]

19   Reac Group, Inc., and Parralax Health Sciences, Inc.  S.T. understood that all these stocks

20   were Costello's companies, and that Costello planned to merge them into a conglomerate

21   in the marijuana/hemp business.  According to S.T., she ended up losing approximately

22   $100,000 to $200,000 in her TD Ameritrade account.

23

24

25

26   _____

27   [4] This appears to be a reference to Costello's prior scheme involving GRNF where the stock price rose dramatically.
    [5] The investigation has revealed that China Network International Holdings may have been another stock Costello

28   manipulated or made material misrepresentations about to investors.  Specifically, TD Ameritrade has provided
    information that the stock of China Network International Holdings was one of the stocks in which Costello's
    account engaged in matched trading as set forth below.

Affidavit of Special Agent Moran - 19                                UNITED STATES ATTORNEY
USAO# 2019R00959                                                   700 STEWART STREET, SUITE 5220
                                                                     SEATTLE, WASHINGTON 98101
                                                                          (206) 553-7970

**Investors B.M. and J.M.**

61.     Costello met investors B.M and J.M.,[6] a married couple, in January 2019. Costello told B.M. and J.M. that he was a self-made hedge fund billionaire and that he managed money for wealthy people, including a Saudi sheikh.  Costello also said that he had a Master of Business Administration (MBA) from Harvard, and that he was in the Special Forces, shot twice and had shrapnel in his leg.  In order to portray himself as a successful billionaire, at one point, Costello expressed interest in buying a multi-million dollar house through B.M., a real estate agent.  For B.M. to be able to show Costello an $11 million dollar house that was for sale, B.M. told Costello that he needed to provide proof of funds showing that he had sufficient funds to buy the house.  In response, Costello gave B.M. a May 2019 bank statement for GRN Funds LLC, showing a balance of approximately $9 million dollars.  Thus, Costello led B.M. to believe the funds belonged to Costello and he was a successful money manager. In fact, the funds belonged to Costello's client, the cannabis company described above for which Costello was purportedly providing banking services.  Based upon Costello's false representations, B.M. and J.M. purchased 500,000 shares of GRN Holding Corporation, a Washington State corporation controlled by Costello.  In July 2019, B.M. and J.M. also purchased 9,000,000 restricted shares of DCGD from Costello, for a price of $1,800,000.

*Costello conducts trades of DCGD/GRNF and RVDO/HPST in B.M. and J.M.'s account*

62.     In addition to soliciting them to invest directly in his companies, Costello offered to manage B.M. and J.M.'s money in an investment trading account.  Costello told B.M. that he was a "licensed investment guy" and did not tell B.M. and J.M. the truth - that neither he nor his purported hedge fund were registered as investment advisers or as a broker/dealer, and that he did not hold any securities licenses.   Costello directed B.M. and J.M. to open a brokerage account at TD Ameritrade, which they did in July 2019, funding the account with $4,000,000.  B.M. and J.M. signed an agreement with

---

[6] As a result of Costello's conduct, B.M. and J.M. have filed a civil lawsuit against Costello in King County Superior Court seeking recovery of millions of dollars.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Costello to pay him 20% of the profits in their account.  Costello represented that he was providing them a "friends and family" discount, and that he was waiving his typical capital management fee.  B.M. and J.M. provided Costello with the login and password information for their brokerage account.  Thereafter, Costello conducted all of the trading in B.M. and J.M.'s account.

63.     On August 1, 2019, a representative of TD Ameritrade asked B.M. if she were being charged a fee for advice about the brokerage account.  B.M. asked Costello how to respond and Costello told B.M. to respond "no."  Costello provided B.M. and J.M. a $29,553.17 invoice, dated August 29, 2019, for 20% profit sharing in their account, which they paid.  Attached to the invoice was a list of the transactions in the account in July 2019, consisting entirely of purchases and sales of DCGD, the company in which Costello, through GRN Funds LLC, had acquired a controlling interest on June 20, 2019.  At the same time, DCGD was experiencing an increase in share price: from approximately $.003 per share at the end of June 2019 to $.39 per share by the end of July 2019, even though DCGD still did not earn any revenue or have any business operations.  During the SEC investigation, the SEC served B.M. with an administrative subpoena.  After B.M. informed Costello about the subpoena, Costello told B.M. to tell the SEC that she had made the trades in her account.  Based on my training and experience, I believe Costello used B.M. and J.M.'s TD Ameritrade account to purchase and sell DCGD to inflate the trading volume and share price of DCGD.

**C.     Costello paid for promotion of DCGD/GRNF and RVDO/HPST**

64.     Costello also used paid promotion to increase the share prices of DCGD/GRNF and RVDO/HPST.  David Ferraro is a prolific Twitter user who tweets under the username "@computerbux."  Ferraro began tweeting about DCGD on July 15, 2019, and he continued to tweet about DCGD every day throughout the remainder of July 2019, often tweeting multiple times a day.  For example, on July 16, 2019, Ferraro tweeted, "$DCGD If you miss this boat to a potential $30 a share on the largest RM [reverse merger] in 15 years, you're going to KICK YOURSELF."  As Ferraro was

Affidavit of Special Agent Moran - 21
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 tweeting about DCGD, its share price was increasing.  On September 3, 2019, Ferraro

2 tweeted about DCGD approximately 129 times, and DCGD closed at $1.21 per share.

3 One of Ferraro's tweets that day read, "$DCGD You haven't seen nothin [sic] yet! I've

4 got word that more whales are coming and we have institutions buying too with hedges!!

5 We're gonna go $3-5 today likely!!!"

6       65.    Ferraro began tweeting about RVDO on April 28, 2020, sending out

7 approximately 35 tweets that day regarding the company (in addition to approximately 55

8 tweets about GRNF).  Ferraro tweeted almost every single day in May and June 2020,

9 and by the end of June 2020, RVDO had reached a high price of almost $2.00 per share,

10 from a price of about $.30 a share at the end of April, 2020.  Ferraro usually tweeted

11 about RVDO multiple times a day, for example, on May 8, 2020, he tweeted 81 times,

12 including such tweets as, "$RVDO This is going to be so much fun when it gets over

13 $12."

14       66.    It appears that Costello paid Ferraro for his services on at least one

15 occasion.  On January 3, 2020, a $23,520 wire was sent from a bank account belonging to

16 GRN Funds LLC to Ferraro, with the memo "Vendor Payment."  In addition, an email

17 from Ferraro to Costello on January 4, 2020, identified their current process as: "1.

18 Analyst identifies the stock.  2. I announce it and it runs on hype but short lived."

19 **D.**    **Costello profited in his own accounts**

20       67.    An analysis of the trading in brokerage accounts Costello controlled is still

21 ongoing, however, there is probable cause to believe that Costello orchestrated investor

22 purchases and promotions of DCGD/GRNF and RVDO/HPST in order to increase the

23 price of these stocks and to profit from the price increases.  Costello opened a TD

24 Ameritrade account ending in 9452 in the name of GRN Funds LLC on June 3, 2019.

25 Costello also opened a TD Ameritrade account ending in 9351 in his name on November

26 26, 2018.  According to information provided by TD Ameritrade, between September 12,

27 2019 and October 8, 2019, Costello's accounts engaged in 12 instances of matched

28 trading in several stocks, including GRNF, with B.M. and J.M.'s TD Ameritrade account.

Affidavit of Special Agent Moran - 22
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Matched trading occurs when an individual (or individuals) enter coordinated trades for

2  the purchase or sale of a security to give the appearance of liquidity and volume and drive

3  the price of the stock higher.

4        68.    Costello opened a Charles Schwab account ending in 7493 in his name on

5  November 5, 2019.  Costello began purchasing RVDO shares on January 31, 2020, and

6  by March 3, 2020, Costello had accumulated approximately 2.1 million shares of RVDO

7  at an average price of approximately $.05 per share.  Costello sold 120,000 shares of

8  RVDO in February 2020, before selling an additional 844,923 shares of RVDO between

9  May 21, 2020 and June 8, 2020 at an average price of approximately $.41 per share, for a

10  total profit of $314,765.  As of June 30, 2020, Costello still held approximately 1.1

11  million shares of RVDO, which traded at a high of $1.94 per share on that day, even

12  though RVDO still had no revenue or business operations.  Based on my training and

13  experience, I believe Costello encouraged J.W., D.W., and S.T. to purchase RVDO, and

14  paid Ferraro to promote RVDO, in order to create a demand for RVDO and increase its

15  share price so that Costello could profit from the sale of his RVDO shares.

## VI.     RELEVANCE OF FACEBOOK ACCOUNTS.

16

17        69.    Costello used the Subject Facebook Accounts to promote his companies to

18  investors and attempt to manipulate the price of these companies' shares.  Investors B.M.

19  and J.M. were members of the Facebook groups GRN Holding Corporation, GRNF VIP,

20  and GRN Holding Corporation Empire.  B.M. described the nature of Costello's posts to

21  the Facebook groups as describing how hard Costello was working to build shareholder

22  value, pumping GRNF, and anticipating company events.

23        70.    On at least two occasions, Costello directed B.M. to post in two of the

24  Subject Facebook Accounts.  On September 11, 2019, Costello texted the following to

25  B.M.: "Post on both facebook groups.  Got my checkbook ready for tomorrow.  I will

26  take all you sell.  Don't [sic] mess with texas."  B.M. responded, "Posted."  On

27  September 12, 2019, it appears that Costello directed B.M. to post information showing

28

that B.M. had significant interest in DCGD.  Costello and B.M. exchanged the following
text messages:

> JC:  "Hello my name is [B.M.], my husband and I own 2.5 million shares of this
> company (DCGD's) float, I have invested in this company because I know Justin
> personally and his team and I believe in them and what they do.  If you want to
> sell your shares my husband and I will buy them.  Seattle takes care of its business
> people and Justin is one of its prodigal sons.
> JC: Please change anything you want and post
> BM: I thought we had 9.5 million?
> JC: You have 2.5 million in the float and 9 million restricted.  I would only discuss
> the [sic] 2.5 million as its relative to that group.
> JC: 11.5 million total!
> BM: [smiling emoji]
> BM: Okay great!
> JC: Local titans are showing me love
> JC: Jeff B and Bill G already reached.  I am in the B club now.
> JC: They are supporting us now.
> BM: Just posted! Love you J-Ustin
> JC: Love you [J.M. and B.M.]"

Based on my training and experience, I believe Costello was telling B.M. that Jeff Bezos
and Bill Gates reached out to him, that Costello was now in the billionaires' club, and
that Bezos and Gates were supporting Costello.  B.M. confirmed that she posted in the
Facebook groups the statements Costello scripted for her, making it appear that she was
supporting Costello and providing a market for GRNF.

71.     According to investor J.W. and Costello's then-girlfriend, in approximately
April 2020, Costello posted on one of the GRN Facebook groups a picture of himself
next to an oxygen tank, purportedly suffering from Covid-19.  The day before the post,
Costello told J.W. that he was going to play a "medical thing" to drive down the price of
GRNF to purchase more stock (at the reduced price).  Costello explained the Facebook
post to his girlfriend as a "business tactic."

72.     **GRN Holding Corporation:** The Facebook page for GRN Holding
Corporation is currently deactivated.  Investors B.M. and J.M provided to investigators
Facebook email notifications for posts made by individuals, likely investors, to the GRN

Affidavit of Special Agent Moran - 24
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Holding Corporation page at the end of 2019 and the beginning of 2020. One of the

2   emails shows a post, dated January 18, 2020, that states, "You don't have to see it! You

3   just have to believe it! GRNF for Life…..", and the email indicates that Costello

4   commented on the post. The content of Costello's comment does not appear in the email

5   notification.

6      73.   **GRNF VIP:** GRNF VIP is a private Facebook group that was created on

7   September 2, 2019. The main page shows that it has 1,200 members and the current

8   administrator is Tim Perkins. It is unknown what the connection is between Perkins and

9   GRNF. K.M., an investor in GRNF and RVDO, provided to investigators a post made to

10  the GRNF VIP page by Donald Shearin, who was the previous administrator of the

11  group. At one point, Shearin handled Investor Relations for GRNF, and on July 10,

12  2020, Shearin was issued 175,000 shares of RVDO under a "participation agreement."

13  Shearin wrote in his post that he invited Costello to the page to post videos and updates.

14     74.   **GRN Holding Corporation Empire:** GRN Holding Corporation Empire

15  is a private Facebook group that was created on July 28, 2019, and it is described as

16  "Entertainment. Learning. Education. Creativity. Inspiration. Investment ideas." The

17  main page shows that it has 964 members, and its current administrators/moderators are:

18  Kelly Brady, Lance Broussard, Yvette Tipsword, John E. Windsor, Hercules Singh,

19  Marsha Lacroix, Bigb Wolf, and Barry James. It is unknown what the connection is

20  between these individuals and GRN Holding Corporation.

21     75.   On September 9, 2019, investor J.M. received an email notification from

22  Facebook that Justin Costello posted on the GRN Holding Corporation Empire page.

23  Costello's post shared a photo and mentioned helping shareholders in the Caribbean.

24  According to B.M., Costello told her that he gave a million dollars to the Bahamas for

25  hurricane relief. A review of Costello's financial records does not support this assertion,

26  and I believe Costello's Facebook post is an attempt to portray himself as a successful

27  and wealthy businessman to the members of the GRN Holding Corporation Empire

28  Facebook page.

Affidavit of Special Agent Moran - 25
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

76.   **Hempstract VIP:**  Hempstract VIP is a private Facebook group that was created on February 28, 2020, and it is described as "A group of potential investors, looking to watch a company grow."  The main page shows that it has 426 members, and Tim Perkins, Joe Peloquin, Joey Rosanova, and Alka Badshah are the current administrators.  Badshah is the Vice President of Mergers and Acquisitions at GRN Holding Corporation.  Badshah also joined the strategic advisory board of RVDO in June 2020.  The connection between Perkins, Peloquin, and Rosanova and Hempstract is unknown.

77.   Investor K.M. provided a post by Costello on the Hempstract VIP page. The post lists Costello as a "Founding Member" and contains graphics of flames, along with the statement, "About to go get some gasoline!"  K.M. understood this to mean that investors should buy shares of RVDO because Costello was about to announce something.

78.   On December 29, 2020, K.M. provided to investigators a post by Badshah on the Hempstract VIP page stating that, "We will be submitting PR and info on tolling agreements on January 5th."  In fact, on January 5, 2021, Hempstract Inc. announced that it had completed its first round of CBD extraction from raw hemp.  Hempstract Inc. also announced that it had entered into a tolling agreement with a Portland, Oregon company which provided that Hempstract Inc. will retain 40% of the finished product.  Thus, it appears that Costello, or those working with or for Costello, used the account to provide material, non-public information to the group before it announced the information to the public.

79.   There is probable cause to believe these Subject Facebook Accounts may contain evidence relevant to the offenses of wire fraud and securities fraud for several reasons.  First, because Costello has made multiple misrepresentations about himself and his companies to investors, the Subject Facebook Accounts are likely to contain posts by Costello making similar misrepresentations.  Second, the purpose of the Subject Facebook Accounts appears to be related to Costello's companies and, given Costello's

1   efforts to generate interest and demand in his companies in order to drive up their share

2   prices, there is reason to believe this activity continued in the Subject Facebook

3   Accounts.  Finally, on at least two occasions Costello scripted an investor's posts in the

4   Subject Facebook Accounts to create the appearance of demand for his companies'

5   shares.  With hundreds of members in the Subject Facebook Accounts, Costello may

6   have used other investors to create artificial posts to misrepresent the market for his

7   companies' shares.

8           **VII.      RELEVANCE OF TWITTER ACCOUNTS.**

9         80.      Like the Subject Facebook accounts, Justin Costello used the Subject

10  Twitter Accounts to promote his companies to investors and attempt to manipulate the

11  price of these companies' shares.  Costello also communicated with at least one investor

12  using direct messages.

13        81.      **@IncGrn:**  According to its public Twitter page, username @IncGrn

14  joined Twitter in August 2019, and has 2,108 followers.  The @IncGrn page contains a

15  picture of Costello and identifies @IncGrn's tweets as protected, so only approved

16  followers can see the tweets.  Tweets by @GRNHoldingCorp identify the username

17  @IncGrn as GRN Holding Corporation's CEO.  On March 6, 2020, @IncGrn direct

18  messaged investor K.M., who asked if this was "JC [Justin Costello] account?".

19  @IncGrn responded that it was JC.

20        82.      Costello further direct messaged K.M. on March 6, 2020, "The new IPO is

21  just about here.  Sharing this with you please keep private."  Costello then posted a link

22  to a website related to Hempstract.  Costello further tweeted, "We had conflict issues

23  rolling these into GRNF so we had to do another one".  It was not until April 28, 2020,

24  that RVDO publicly announced a non-binding letter of intent to acquire the assets of

25  Hempstract LLC.  Thus, it appears that Costello used the Twitter account to provide

26  material, non-public information to at least one investor before it announced the

27  information to the public.

28

83.     Months later, K.M. posted to Facebook snippets of a public lawsuit against Costello and his companies by the California-based cannabis business.  In response, K.M. received a private Twitter message from Costello that included all her personal information and the message, "Keep posting traitor."

84.     **@GRNHoldingCorp:** According to its Twitter page, username @GRNHoldingCorp joined Twitter in November 2019 and has 1,752 followers.  The @GrnHoldingCorp page provides the following description: "All things GRN. OTC Pink: GRNF".  In tweets, @GRNHoldingCorp described itself as Investor Relations for GRN Holding Corporation.  @GRNHoldingCorp has posted tweets from Costello addressed to GRNF shareholders, as well as posts about Costello and GRNF.  For example, on March 9, 2020, @GRNHoldingCorp posted the following: "$GRNF CEO Statement: The current status of the stock market is not reflective of our progress.  GRN Holding remains fully operational, fully capitalized, and on target to meet our preset goals and objectives. @IncGrn", and on March 12, 2020, @GRNHoldingCorp posted this: "$GRNF Our CEO @IncGrn has been through two down market cycles; dot-com & mortgage. His strategy is steadfast w/a solid team behind him. Reacting from panic/fear adds to the problem, not the solution. We prefer to be the exception in the market. Charts tell all…"

85.     **@IrHPST:**  According to its Twitter page, username @IrHPST joined Twitter in April 2020 and has 589 followers.  The @IrHPST page provides the following description: "Official Twitter account for Hempstract Labs."  @IrHPST has posted tweets linking to RVDO and HPST press releases.  @IrHPST also posted whenever Costello purchased HPST shares, for example, on February 11, 2021, @IrHPST posted the following: "On 2/08/2021: Mr. Justin Costello purchased two blocks of restricted shares totaling 319,687 and 203,438 of Hempstract Labs common stock, in a private stock purchase. $HPST."

86.     **@computerbux:** According to its Twitter page, username @computerbux joined Twitter in February 2010 and has 10,600 followers.  As discussed above, David

Affidavit of Special Agent Moran - 28
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Ferraro used @computerbux to post numerous tweets about Costello's companies, and he appeared to be receiving payment from Costello for doing so.  Ferraro also used @computerbux to communicate with investors about Costello's companies.  In March 2020, investor K.M. retweeted a November 2019 post about RVDO.  Ferraro, using @computerbux, then exchanged the following direct messages with K.M. on March 26, 2020:

> @computerbux: "Let's keep the RVDO tweets to zero till filings.
> K.M.: Just doing some back research to see who knew what was up with this ticker and saw that guy mentioning it back in Nov.  Thought that was pretty amazing.  Why you putting the kibosh on tweets for it?  Loading?
> @computerbux:  It doesn't have filings for six years and I don't want the give the SEC a reason to suspend trading until the financials are filed and it gets current.
> K.M.:  That is different?  We could tweet about GRNF when that was in the same position as this ticker is.
> K.M.:  Are we in loading zone?  Is that why?  Until the 'official' news and connections break?
> @computerbux:  Yes, we are in loading zone."

According to K.M., "loading" or "loading zone" means buying shares before information is made public in order to sell them after the stock price rises after the stock is touted or "pumped."  Thus, it appears from this exchange that Ferraro was privy to material non-public information about RVDO and he was directing K.M's actions based on this information.

87.    There is probable cause to believe the Subject Twitter Accounts will contain evidence relevant to the offenses of wire fraud and securities fraud for several reasons.  First, because Costello has made multiple misrepresentations about himself and his companies to investors, the Subject Twitter Accounts are likely to contain tweets by Costello making similar misrepresentations.  Second, the purpose of the Subject Twitter Accounts appears to be related to Costello's companies and, given Costello's efforts to generate interest and demand in his companies in order to drive up their share prices, there is reason to believe this activity continued in the Subject Twitter Accounts.  Finally,

1  both Costello and Ferraro appear to have used their Subject Twitter Accounts to provide

2  material, non-public information about Costello's companies.

### VIII.   PAST EFFORTS TO OBTAIN EVIDENCE.

4       88.     As described above, I have received certain information concerning the

5  Subject Facebook Accounts and Subject Twitter Accounts from investors and others

6  involved with Costello.  However, I understand that the full contents of the Subject

7  Facebook and Twitter Accounts can only be obtained, in the Ninth Circuit, by means of a

8  search warrant issued under authority of Title 18, United States Code, Sections 2703(a),

9  2703(b)(1)(A), 2703(c)(1)(A), and Rule 41(e)(2)(b) of the Federal Rules of Criminal

10  Procedure.  To my knowledge, there have been no prior attempts to secure a search

11  warrant to search and seize these records.  On December 30, 2020, a preservation request

12  was sent to Facebook, asking that the existing contents of the Facebook accounts GRN

13  Holding Corporation, GRNF VIP, GRN Holding Corporation Empire, and Hempstract

14  VIP be preserved, under authority of Title 18, United States Code, Section 2703(f)(1), for

15  a period of 90 days.  On May 28, 2021, I sent a second preservation request to Facebook.

### IX.     INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

17      89.     I anticipate executing this warrant under the Electronic Communications

18  Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by

19  using the warrants to require Facebook and Twitter to disclose to the government copies

20  of the records and other information (including the content of communications)

21  particularly described in Section I of Attachment B and D.  Upon receipt of the

22  information described in Section I of Attachment B and D, government-authorized

23  persons will review that information to locate the items described in Section II of

24  Attachment B and D.

25      90.     Based upon my training and experience, communications potentially

26  protected by the attorney-client privilege are not typically found in social networking

27  applications, such as Facebook and Twitter.  If, however, an investigative agent

28  conducting the search of the records produced by Facebook and Twitter should identify

Affidavit of Special Agent Moran - 30
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   any electronically stored data that may contain privileged information, the agent will

2   immediately cease searching the records and one agent (the "taint agent") and one

3   Assistant United States Attorney (AUSA) (the "taint counsel") will be assigned to serve

4   as a taint team to review potentially privileged material found during the execution of the

5   warrant.  The members of the taint team will have had no prior involvement in the

6   investigation, and will have no further role in the investigation or prosecution of this case,

7   unless further privilege issues arise requiring additional review or unless some aspect of

8   the taint team is litigated in court.  The taint team members will not reveal the contents of

9   any document or file determined to contain privileged material to any other person,

10  except counsel for a subject of a search warrant or holder of a privilege, unless otherwise

11  ordered by the court.

12      91.     The taint agent will then conduct a review of all data produced by Facebook

13  and Twitter to identify potentially privileged information.  If the taint agent identifies any

14  documents containing privileged information, the taint agent will segregate and maintain

15  the documents for later production to the attorney for the holder of the privilege, if

16  necessary. The taint agent will then seal the materials containing privileged information

17  pending conclusion of the investigation/prosecution or court order, and arrange for such

18  materials to be segregated from any materials provided to investigative agents. If the taint

19  agent has any question about whether such information is privileged, the taint agent will

20  provide such information to the taint counsel for a determination. If the taint counsel

21  agrees that such items contain privileged information, the taint counsel will direct the

22  taint agent to maintain the documents for later production to the attorney for the holder of

23  the privilege, if necessary, and to arrange for such materials to be segregated from any

24  materials provided to investigative agents. If the taint counsel has any question about

25  whether such information is privileged, the taint counsel will submit such information to

26  the Court in camera for a judicial determination as to whether the information is

27  privileged.  If the Court deems the information to be privileged, the taint agent will

28  arrange for such materials to be segregated from any materials provided to investigative

Affidavit of Special Agent Moran - 31
USAO# 2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  agents, and maintain the documents for later production to the attorney for the holder of
2  the privilege, if necessary.

3       92.     After the taint agent completes the privilege review, an investigative agent
4  will conduct the search of the records produced by Facebook and Twitter.  The
5  investigative agent will be responsible for making the initial determination as to whether
6  particular items fall within the scope of the items to be seized under the warrant. Items
7  that do not fall within the scope of items to be seized will not be seized.

8       93.     If during their relevance review, an investigative agent finds a document or
9  other tangible item that may contain privileged information, that agent will immediately
10  place it in a container identified as containing possibly privileged information. The agent
11  will then provide the container to the taint agent who will take custody of the material.

12            **X.    REQUEST FOR NONDISCLOSURE AND SEALING.**

13       94.     The United States requests, pursuant to the preclusion of notice provisions
14  of Title 18, United States Code, Section 2705(b), that Facebook and Twitter be ordered
15  not to notify any person (including the subscriber or customer to which the materials
16  relate) of the existence of these warrants for such period as the Court deems appropriate.
17  The government submits that such an order is justified because notification of the
18  existence of this Order would seriously jeopardize the ongoing investigation.  Such a
19  disclosure would give the subscriber an opportunity to destroy evidence, change patterns
20  of behavior, notify confederates, or flee or continue flight from prosecution.

21       95.     It is further respectfully requested that this Court issue an order sealing,
22  until further order of the Court, all papers submitted in support of this application,
23  including the application and search warrants.  I believe that sealing this document is
24  necessary because the items and information to be seized are relevant to an ongoing
25  investigation, and law enforcement may still attempt to execute search warrants at other
26  relevant locations before the investigation concludes.  Premature disclosure of the
27  contents of this affidavit and related documents may have a significant and negative
28  impact on the continuing investigation and may severely jeopardize its effectiveness.

Affidavit of Special Agent Moran - 32
USAO# 2019R00959

# XI.   CONCLUSION.

96.     For the reasons set forth above, there is probable cause to believe that evidence, fruits and/or instrumentalities of Title 18, United States Code, Sections 1343 (Wire Fraud) and 1348 (Securities Fraud) will be found in the electronically stored information or communications contained and associated with the Subject Facebook and Twitter Accounts, as well as in the subscriber and log records associated with that account.  Accordingly, by this Affidavit and Warrant, I seek authority for the government to search all of the items specified in Section I, Attachment B and D (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment to the Warrant.

_____
KATHLEEN MORAN
Special Agent
Federal Bureau of Investigations


The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone on this 16th day of June, 2021.


_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2

**ATTACHMENT A**
**Location to be Searched**

3

This warrant applies to information associated with the Facebook users:

4
5

- Justin Costello = user ID 100040587769665

6

- GRN Holding Corporation = user ID GRNHoldingCorp

7

- GRNF VIP = user ID 910260356004696

8
9

- GRN Holding Corporation Empire = user ID 914636418886355

10

- Hempstract VIP = user ID 517576265620242

11

that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

**I.     Items to be Provided by Facebook**:

    To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

    a.     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    b.     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from September 1, 2017 to present;

    c.     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from September 1, 2017 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

    d.     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

    e.     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

    f.     All other records and contents of communications and messages made or received by the user from September 1, 2017 to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

g.      All "check ins" and other location information;

h.      All IP logs, including all records of the IP addresses that logged into the account;

i.      All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

j.      All information about the Facebook pages that the account is or was a "fan" of;

k.      All past and present lists of friends created by the account;

l.      All records of Facebook searches performed by the account from September 1, 2017 to present;

m.      All information about the user's access and use of Facebook Marketplace;

n.      The types of service utilized by the user;

o.      The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

p.      All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

q.      All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Facebook is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.**

**II.      Information to be Seized**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud) and Section 1348 (Securities Fraud) involving Justin Costello and companies associated with Costello since September 1, 2017, including, for each user ID identified on Attachment A, information pertaining to the following matters:

1.      Evidence of any attempt or plan to manipulate the price of any stock or other securities, including evidence of: (a) planning or executing a plan to obtain control of a company's publicly-traded securities, (b) matched, cross, or wash trading, and (c) communications concerning promoting stock or other securities;

2.      Evidence of the solicitation of any investor or potential investor;

3.      Evidence related to the receipt of investment proceeds or any payments to investors or potential investors;

4.      Evidence related to the transfer, purchase, sale, or disposition of stock or other securities;

5.      Evidence related to financial transactions associated with Justin Costello, any entity under his control, or any individual working at the direction of Costello, including bank accounts or brokerage accounts held by Justin Costello, any entity under his control, or any individual working at the direction of Costello, expenditures of money or wealth, and bank and brokerage records;

6.      Evidence related to the receipt of investor funds, including the amount, purpose of investment, and plans for spending or investing the funds;

7.      Evidence related the possible transfer or disposition of the proceeds of the fraud, including but not limited: to accounts at banks or other financial institutions; financial transactions or transfers; the purchase, transfer or sale of assets; the use of the proceeds of the fraud to buy real property, vehicles, or goods or services; and any explanations, reports, or other information regarding the amount and sources of funds or other income;

8.      Evidence of any communications between Justin Costello, any entity under his control, or any individual working at the direction of Costello and any investors or potential investors;

9.      Evidence of any communications by Justin Costello, any entity under his control, or any individual working at the direction of Costello concerning any entity under Costello's ownership or control;

SEARCH WARRANT ATTACHMENTS - 3
USAO#2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10.     Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

11.     Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

12.     Evidence relating to efforts to evade law enforcement or securities regulators;

13.     Evidence that serves to identify any person who uses or accesses the account or who exercises in any way any dominion or control over the account, including records that help reveal the whereabouts of such person(s).

14.     Evidence identifying the Android, Apple, or other electronic devices linked to the account, including make and model, IMEI or other unique numbers identifying any device;

15.     Evidence of the geolocation of the user during the use of the provider's services.

16.     All subscriber associated with the specified account, including name, address, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service) including any credit card or bank account number;

17.     Any records of communications between the internet service provider, and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications;

SEARCH WARRANT ATTACHMENTS - 4
USAO#2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

18.     Any address lists, contact lists or other lists associated with the specified account that may identify co-conspirators or victims; and

19.     Any and all other log records, including IP address captures, associated with the specified account.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

SEARCH WARRANT ATTACHMENTS - 5
USAO#2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2

**ATTACHMENT C**
**Location to be Searched**

3
4

This warrant applies to information associated with the following Twitter accounts:

5
6

        **a.**      User name: @IncGrn
                 URL:  https://twitter.com/IncGrn

7
8

        b.      User name: @GRNHoldingCorp
                 URL: https://twitter.com/grnholdingcorp

9
10

        c.      User name: @IrHPST
                 URL: https://twitter.com/irhpst

11
12
13

        d.      User name: @computerbux
                 URL: https://twitter.com/computerbux

14
15

that are stored at premises owned, maintained, controlled, or operated by Twitter, a company headquartered in San Francisco, California.

16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT D**
**ITEMS TO BE SEIZED**

**I.     Items to be Provided by Twitter:**

To the extent that the information described in Attachment C is within the possession, custody, or control of Twitter, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Twitter, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to disclose the following information to the government for each account listed in Attachment C:

(a)     All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers;

(b)     All past and current usernames, account passwords, and names associated with the account;

(c)     The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

(d)     All IP logs and other documents showing the IP address, date, and time of each login to the account;

(e)     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

(f)     All "Tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those Tweets and Direct Messages;

(g)     All information from the "Connect" tab for the account, including all lists of Twitter users who have favorited or retweeted Tweets posted by the account, as well as a list of all Tweets that include the username associated with the account (*i.e.*, "mentions" or "replies");

(h)     All photographs and images in the user gallery for the account;

(i)     All location data associated with the account, including all information collected by the "Tweet With Location" service;

(j)     All information about the account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the account was clicked;

(k)     All data and information that has been deleted by the user;

(l)     A list of all of the people that the user follows on Twitter and all people who are following the user (*i.e.*, the user's "following" list and "followers" list);

(m)     A list of all users that the account has "unfollowed" or blocked;

(n)     All "lists" created by the account;

(o)     All information on the "Who to Follow" list for the account;

(p)     All privacy and account settings;

(q)     All records of Twitter searches performed by the account, including all past searches saved by the account;

(r)     All information about connections between the account and third-party websites and applications;

(s)     All records pertaining to communications between Twitter and any person regarding the user or the user's Twitter account, including contacts with support services, and all records of actions taken, including suspensions of the account.

**Twitter is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.**

## II.     Information to be Seized

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1343 (Wire Fraud) and Section 1348 (Securities Fraud) involving Justin Costello and companies associated with Costello since September 1, 2017, including, for each user ID identified on Attachment C, information pertaining to the following matters:

SEARCH WARRANT ATTACHMENTS - 2
USAO#2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1.      Evidence of any attempt or plan to manipulate the price of any stock or other securities, including evidence of: (a) planning or executing a plan to obtain control of a company's publicly-traded securities, (b) matched, cross, or wash trading, and (c) communications concerning promoting stock or other securities;

2.      Evidence of the solicitation of any investor or potential investor;

3.      Evidence related to the receipt of investment proceeds or any payments to investors or potential investors;

4.      Evidence related to the transfer, purchase, sale, or disposition of stock or other securities;

5.      Evidence related to financial transactions associated with Justin Costello, any entity under his control, or any individual working at the direction of Costello, including bank accounts or brokerage accounts held by Justin Costello, any entity under his control, or any individual working at the direction of Costello, expenditures of money or wealth, and bank and brokerage records;

6.      Evidence related to the receipt of investor funds, including the amount, purpose of investment, and plans for spending or investing the funds;

7.      Evidence related the possible transfer or disposition of the proceeds of the fraud, including but not limited: to accounts at banks or other financial institutions; financial transactions or transfers; the purchase, transfer or sale of assets; the use of the proceeds of the fraud to buy real property, vehicles, or goods or services; and any explanations, reports, or other information regarding the amount and sources of funds or other income;

8.      Evidence of any communications between Justin Costello, any entity under his control, or any individual working at the direction of Costello and any investors or potential investors;

9.      Evidence of any communications by Justin Costello, any entity under his control, or any individual working at the direction of Costello concerning any entity under Costello's ownership or control;

SEARCH WARRANT ATTACHMENTS - 3
USAO#2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10.     Evidence of the identity of the user(s) of the account;

11.     Evidence of the location or whereabouts, both current and historical, of the user(s) of the account;

12.     Evidence indicating the account user's state of mind as it relates to the crime under investigation;

13.     Evidence of the identity or location of co-conspirators engaged in criminal conduct;

14.     All messages, documents, and profile information, attachments, or other data that serves to identify any persons who use or access the account specified, or who exercise in any way any dominion or control over the specified account;

15.     Any address lists or buddy/contact lists associated with the specified account, and other information regarding potential co-conspirators, criminal associates, or suspected victims or targets (i.e., attempted victims) of the fraudulent conduct and scheme;

16.     Evidence of ownership or use of any items used to facilitate the fraudulent scheme or the existence and location of any proceeds;

17.     All subscriber records associated with the specified account, including name, address, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service) including any credit card or bank account number;

18.     Any and all other log records, including IP address captures, associated with the specified account;

19.     Any records of communications between Twitter, and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between

1   the subscriber and the provider's support services, as well as records of any actions taken

2   by the provider or subscriber as a result of the communications;

3        20.    Any complaints and records relating to any adverse action taken on the

4   account, including an account suspension for violations of Twitter terms of service,

5   whether temporary or permanent, the details surrounding that adverse action, and any

6   communications related thereto.

7

8   This warrant authorizes a review of electronically stored information, communications,
    other records and information disclosed pursuant to this warrant in order to locate

9   evidence, fruits, and instrumentalities described in this warrant.  The review of this
    electronic data may be conducted by any government personnel assisting in the

10  investigation, who may include, in addition to law enforcement officers and agents,

11  attorneys for the government, attorney support staff, and technical experts.  Pursuant to
    this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the

12  custody and control of attorneys for the government and their support staff for their

13  independent review.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SEARCH WARRANT ATTACHMENTS - 5
USAO#2019R00959

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970